**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| PETER SOLANO,<br><br>                    Plaintiff,<br>        -against-<br><br>VELOCITY HOLDINGS LLC, VCT TECHNOLOGIES LLC, VELOCITY CLEARING, LLC, VELOCITY CAPITAL, LLC, DOMINICK MIGLIORATO, MICHAEL LOGAN, ROBERT CALICE, TIM CONNELLY, JOHN MEREDITH and FRANK BRACERO,<br><br>                    Defendants. | Case No.<br><br>**COMPLAINT**<br><br><br>**PLAINTIFF DEMANDS**<br>**A TRIAL BY JURY** |

Peter Solano ("Plaintiff" or "Mr. Solano"), by his attorneys, Mesidor, PLLC, against Velocity Holdings LLC ("Defendant Holdings"), VCT Technologies LLC ("Defendant Technologies"), Velocity Clearing, LLC ("Defendant Clearing") and Velocity Capital, LLC ("Defendant Capital") (collectively, "Corporate Defendants" or "VCT Group") and Dominick Migliorato, Michael Logan, Robert Calice, Tim Connelly, John Meredith and Frank Bracero (collectively "Individual Defendants"), alleges upon knowledge as to himself and his own actions and upon information and belief as to all other matters as follows:

## NATURE OF CLAIMS

1.     Plaintiff began working for Defendants on December 1, 2022., as an Information Technology ("IT") Specialist.

2.     Mr. Solano was born with Cystic Fibrosis ("CF"), a genetic condition that causes defects in the production of a protein known as cystic fibrosis transmembrane conductance regulator ("CFTR"). This protein is essential for maintaining the balance of salt and water in the body and plays a critical role in the proper functioning of the respiratory and digestive systems.

Individuals with CF, like Mr. Solano, typically experience symptoms such as thick mucus that impairs breathing and increases the risk of lung infections, as well as blockages in the pancreatic ducts, which interfere with digestion.

3.     At the time that Plaintiff commenced his employment, he was in good health and free of symptoms related to his cystic fibrosis (CF), thanks to the effectiveness of his prescribed medication, Trikafta.

4.     Plaintiff's condition began to deteriorate after he started working for Defendant VCT Group at their downtown Manhattan office. On his first day and for the duration of his employment, he observed several coworkers vaping indoors. Within a week, he began experiencing respiratory symptoms that had not occurred in the years since starting Trikafta.

5.      These symptoms persisted and worsened over the following months. By May and June of 2023, he was forced to resume multiple medications he had previously been able to discontinue.

6.     As a result, he endured negative side effects, struggled with mental health challenges due to uncertainty about his health, and suffered a substantial decline in respiratory function. This significantly impacted his daily life, requiring frequent albuterol nebulizer treatments, inhaled steroids, and rescue inhalers just to manage basic activities.

7.     In late October 2023, mentally and physically distraught, Plaintiff, desperate to understand the cause of his worsening health, reached out to his doctor to ask if inhaling secondhand vape smoke could be a contributing factor. His doctor responded that vaping "certainly could be contributing" to his symptoms and expressed surprise that vaping was permitted indoors in the office. After his doctor confirmed that vaping could be a contributing factor in his

deteriorating condition, Plaintiff made several complaints to VCT Group, beginning in November 2023 and up until June 26, 2024, requesting that they prevent employees from vaping in the office.

8.      Despite assurances from VCT Group, unsatisfactory actions were taken to stop the in-office vaping, causing Plaintiff to continue suffering. Worse still, frustrated by his reasonable request for accommodation due to his disability, VCT Group began a campaign of retaliation culminating in a termination of his employment in July 2024 after his continued complaints.

9.      Plaintiff's requests for a reasonable accommodation to stop in-office vaping were made under the protections of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*. As an individual with cystic fibrosis, a condition that substantially limits one or more major life activities, Plaintiff is entitled to protections under the ADA, as well as under state and city laws. Despite Plaintiff's multiple requests for accommodation, Defendants failed to provide sufficient or meaningful measures to address the harmful exposure, in direct violation of their obligations under the ADA, the NYSHRL and the NYCHRL.

10.     As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

11.     Mr. Solano by and through his undersigned counsel, alleges violations of the ADA; the NYSHRL and the NYCHRL.  Mr. Solano seeks declaratory relief, injunctive relief, backpay, front pay, compensatory damages, punitive damages, interest, attorneys' fees, and costs.

## **PARTIES**

*Peter Solano*

12.     Peter Solano is a male who resides in Westchester County, New York.

13.     Mr. Solano has a diagnosis of Cystic Fibrosis ("CF"), a genetic condition that causes defects in the production of a protein known as cystic fibrosis transmembrane conductance regulator ("CFTR"). CF is a recognized disability under the ADA, NYSHRL and the NYCHRL.

*Defendants*

14.     Defendant Holdings is and has been a capital market company registered to do business under the laws of New Jersey, with a corporate office located at 1302 NJ-36 Suite 109 Hazlet, NJ, 07780.

15.     Defendant Holdings additionally maintains an office located at 199 Water Street, 17th Floor, New York, NY.

16.     At all times relevant, Defendant Holdings employed fifteen or more employees.

17.     Upon information and belief, Defendant Technologies is a wholly owned subsidiary of Defendant Holdings.

18.     At all relevant times herein, upon information and belief, Defendant Technologies is and has been an information technology company registered to do business under the laws of New Jersey, with a corporate office located at 1302 NJ-36 Suite 109 Hazlet, NJ, 07780.

19.     Defendant Technologies additionally maintains an office located at 199 Water Street, 17th Floor, New York, NY.

20.     At all times relevant, Defendant Technologies employed more than fifteen employees.

21.     Upon information and belief, Defendant Clearing is a wholly owned subsidiary of Defendant Holdings.

22.     At all relevant times herein, upon information and belief, Defendant Clearing is and has been a brokerage company registered to do business under the laws of New Jersey, with a corporate office located at 1302 NJ-36 Suite 109 Hazlet, NJ, 07780.

23.     Defendant Holdings additionally maintains an office located at 199 Water Street, 17th Floor, New York, NY. At all times relevant, Defendant Clearing employed more than fifteen employees.

24.     Upon information and belief, Defendant Capital is a wholly owned subsidiary of Defendant Holdings.

25.     At all relevant times herein, upon information and belief, Defendant Capital is and has been a brokerage company registered to do business under the laws of New Jersey, with a corporate office located at 1302 NJ-36 Suite 109 Hazlet, NJ, 07780.

26.     Defendant Capital additionally maintains an office located at 199 Water Street, 17th Floor, New York, NY. At all times relevant, Defendant Capital employed more than fifteen employees.

27.     The Corporate Defendants are "joint employers" of Plaintiff as the Defendants share a common open workspace, utilize the same technology systems and communication platforms, and rely on a unified human resources department for hiring, payroll, benefits administration, and employee relations. Through this shared infrastructure and integrated management, the Defendants exercise interrelated control over employees' terms and conditions of employment, including supervision, discipline, and termination of decisions.

28.     Dominick Migliorato ("Defendant Migliorato") is/was the CEO of VCT Technologies.  As Chief Executive Officer of VCT Technologies, Defendant Migliorato had the

ability to make personnel decisions and otherwise affect the terms and conditions of Plaintiff's employment. Defendant Migliorato is being sued herein in his individual and official capacities.

29.      Michael Logan ("Defendant Logan) is/was the Chief Executive Officer of Velocity Clearing. As the CEO of Velocity Clearing, Defendant Logan had the ability to affect the terms and conditions of Plaintiff's employment. Defendant Logan is being sued herein in his individual and official capacities.

30.      Robert Calice ("Defendant Calice") is/was the Chief Operating Officer of Velocity Clearing. As the Chief Operating Officer of Velocity Clearing, Defendant Calice has the ability to affect the terms and conditions of Plaintiff's employment. Defendant Calice is being sued herein in his individual and official capacities.

31.      Tim Connelly ("Defendant Connelly") is/was the Technologies Chief Information Officer for VCT Technologies. Defendant Connelly served as one of Plaintiff's supervisors and had the ability to make personnel decisions, including hiring and firing, and had the ability to affect the terms and conditions of Plaintiff's employment. Defendant Connelly is being sued herein in his individual and official capacities.

32.      Frank Bracero ("Defendant Bracero") is the Chief Executive Officer of VCT Holdings, Velocity Capital and Velocity Clearing. As the CEO of these entities, Defendant Bracero had the ability to make personnel decisions, including hiring and firing, and the ability to affect the terms and conditions of Plaintiff's employment. Defendant Bracero is being sued herein in his individual and official capacities.

33.      John Meredith ("Defendant Meredith" is/was a Technologies IT Manager at VCT Technologies. Defendant Meredith served as one of Plaintiff's supervisors and had the ability to

affect the terms and conditions of Plaintiff's employment. Defendant Meredith is being sued herein in his individual and official capacities.

## JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts federal law claims under the ADA.

35.     This Court has supplemental jurisdiction over the claims that Plaintiff has brought under state and city law pursuant to 28 U.S.C. § 1367.

36.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.

## ADMINISTRATIVE PREREQUISITES

37.     Plaintiff filed charges of disability discrimination with the United States Equal Employment Opportunity Commission ("EEOC") under the ADA on November 11, 2024.

38.     Plaintiff received his Notice of Right to Sue from the EEOC on August 26, 2025.

39.     This action is commenced within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue from the EEOC.

## FACTUAL ALLEGATIONS

40.     Mr. Solano joined VCT Group on December 1, 2022, as an Information Technology ("IT") Specialist.

41.     Although his contract, paychecks, and projects were issued by Defendant Technologies, he was assigned projects from supervisors and executives from Defendants Technologies, Holding, Clearing, and Capital

42.     Plaintiff formally reported to Tim Connelly, Defendant Technologies Chief Information Officer ("Defendant Connelly") and John Meredith, Defendant Technologies IT Manager ("Defendant Meredith"); however, Plaintiff frequently worked with supervisors from all other entities.

43.     Additionally, all of the employees from these entities shared the same open-plan office and technology infrastructure as Mr. Solano, located on the 17th floor of 199 Water Street in Manhattan.  These entities also shared the same unified human resources department for hiring payroll, benefits administration, and employee relations.

### Mr. Solano Experiences with Cystic Fibrosis

44.     Mr. Solano was born with Cystic Fibrosis ("CF"), a genetic condition that causes defects in the production of a protein known as cystic fibrosis transmembrane conductance regulator ("CFTR"). This protein is essential for maintaining the balance of salt and water in the body and plays a critical role in the proper functioning of the respiratory and digestive systems. Individuals with CF, like Mr. Solano, typically experience symptoms such as thick mucus that impair breathing and increase the risk of lung infections, as well as blockages in the pancreatic ducts, which interfere with digestion.

45.     Prior to the development of Trikafta, treatments for CF were limited to managing the symptoms rather than addressing the underlying cause of the disease. The median life expectancy for people with CF in 2017, prior to Trikafta, was 44 years. Since the development of this drug, the median life expectancy for people with CF who receive this treatment is 61 years. In essence, Trikafta allows CF patients, for the first time, to live an average lifespan and without the daily stress of managing a heavy pharmaceutical regiment simply to continue breathing.

46.     Prior to taking Trikafta, Plaintiff had to manage his symptoms with a range of prescription medications, including Symbicort, Singulair, Advair, Albuterol, Prednisone, and Ventolin. While this extensive regimen helped maintain his health, it also caused unwanted side effects, such as increased heart rate, tremors, osteopenia, throat irritation, oral thrush, and headaches.

47.     Plaintiff began taking Trikafta in October 2019, and by early 2020, he was able to safely discontinue use of previous medications. After a lifetime of relying on multiple drugs to manage his condition, Trikafta allowed him to live a more normal life.

48.     For the first time, Plaintiff could distance himself from the constant reminders of his illness and felt he had greater control over his disease, whereas before, he had endured the daily stress and challenges of symptom management.

49.     Mr. Solano was able to live this healthy, normal life for three years.

**Plaintiff Begins Employment at VCT Group and Immediately Experiences Symptoms**

50.     Plaintiff began working for VCT Group on December 1, 2022, as an IT Specialist.

51.     At the time that Plaintiff commenced his employment with Defendants, he was in good health and free of symptoms related to his cystic fibrosis (CF), thanks to the effectiveness of his prescribed medication, Trikafta.

52.     Immediately after starting work at VCT's Manhattan office, Mr. Solano observed that Defendant Meredith, who sat directly across from him, regularly vaped indoors.  This was surprising to Plaintiff as he knew vaping indoors was illegal and potentially harmful.

53.     Despite his surprise, however, at that time, Plaintiff did not fully understand the specific dangers of second-hand vape smoke for someone with cystic fibrosis.

54.     Within a week of starting work at VCT Group's Manhattan office, Plaintiff experienced a recurrence of his cystic fibrosis symptoms, including chest congestion, chest discomfort, dyspnea (shortness of breath), and wheezing. Additionally, he began experiencing symptoms consistent with inhalation of second-hand vape smoke, such as a sore throat, nasal congestion, sinusitis, headaches, and dizziness. At first, Mr. Solano mistook these symptoms as those of the common cold or flu or believed that something in his home was triggering them. These symptoms, however, persisted and worsened over the following six months.

### Mr. Solano's Condition Worsens

55.     On May 21, 2023, Plaintiff experienced sudden shortness of breath while resting at home in the evening, requiring the use of his rescue inhaler. Later that night, he awoke twice more with sharp shortness of breath and had to use a nebulizer. This episode marked the start of a significant decline in his condition, as his symptoms persisted for six months without relief.

56.     By June 26, 2023, Plaintiff was using his nebulizer two to three times per day. Shortly thereafter, he was forced to resume taking Symbicort to manage these worsening symptoms.

57.     Mr. Solano's symptoms continued to linger, requiring daily steroid treatments and thirty-minute nebulizer sessions at least twice a day. His condition left him physically and mentally exhausted, unable to enjoy life, and with the existential fear that this increase in symptoms may indicate his condition would result in his early death, something that had not been at the forefront of his mind since he had started Trikafta in 2019.

58.     Furthermore, he had to rely on his wife and parents to care for his 2-year-old son while he underwent multiple daily treatments. Plaintiff's constant worry about his health led to feelings of depression and anxiety, including fears that something more than CF might be wrong.

He frequently felt the need to leave work to get fresh air, and at that time, never considered the connection of his declining health to the second-hand vape smoke in the office.

59.    On August 11, 2023, Mr. Solano experienced significant dizziness during a dentist appointment after leaving work. His health concerns dominated conversations with his wife, and he even suspected issues at home, such as mold, poor air quality, or lead paint disturbances, were causing his symptoms. Difficulty sleeping became a regular challenge, as nightly nebulizer treatments elevated his heart rate and caused trembling. Feeling unwell both physically and mentally, he isolated himself at work, focusing only on his tasks and minding his own business. He avoided social interactions and conversations with others because he simply didn't feel well.

60.    Finally, on October 27, 2023, Plaintiff emailed his doctor to inquire whether exposure to vape smoke could be contributing to his symptoms, particularly from Defendant Meredith due to their close proximity.

61.    This concern arose after witnessing Defendant Meredith exhaling a large cloud of vape smoke. His doctor confirmed that such exposure could indeed be a contributing factor.

**Plaintiff Complains to Supervisors and Requests a Reasonable Accommodation**

62.    Shortly thereafter, on November 2, 2023, Plaintiff discussed the vaping issue with his colleague Chris Volpe, Defendant Technologies' Director of Cyber Security ("Mr. Volpe"), seeking advice on how to address the situation. Mr. Volpe recommended that Mr. Solano speak with Defendant Logan, the CEO of Defendant Clearing, suggesting that this approach would have the greatest impact on stopping the vaping.

63.    Mr. Volpe also advised Plaintiff to avoid approaching Defendant Connelly, expressing concerns that Defendant Connelly might respond to Plaintiff with hostility.

64.    Mr. Solano followed Mr. Volpe's advice and spoke directly to Defendant Logan in his office. During the conversation, Mr. Solano explained that he was diagnosed with Cystic Fibrosis and suspected that the second-hand vape smoke in the office was making him sick, forcing him to resume medications he had stopped using years ago.

65.    Defendant Logan initially appeared shocked that vaping was happening, though Plaintiff later questioned this reaction, after witnessing Defendant Logan vaping during a company sponsored night out.

66.    Defendant Logan instructed him to "calm down" and "breathe," to which Mr. Solano responded that breathing was precisely the problem. Mr. Solano specifically mentioned Defendant Meredith and others vaping, and Defendant Logan assured him that he would stop the behavior immediately.

67.    Plaintiff emphasized he was not seeking to get anyone in trouble, only asking for the vaping to stop out of concern for his own health. Surprisingly, Defendant Logan also advised Plaintiff not to inform Defendant Connelly about the issues, also expressing concern over a potential hostile response.

68.    Afterward, Defendant Logan spoke to Defendant Meredith, and later Christopher Calice Defendant Clearing ("Mr. Calice"), and Nick Lewis, Defendant Clearing ("Mr. Lewis") about vaping in the office.

69.     Mr. Solano witnessed Defendant Logan tell Mr. Calice that vaping would no longer be permitted, to which Mr. Calice responded incredulously, "*Since when*!?"

70.    Following this interaction, Defendant Meredith became visibly angry, determined to discover who had made the complaint, and rallied his colleagues, including Mr. Lewis, Aldo Fracciola, Defendant Technologies ("Mr. Fracciola"), and Christopher Ramroop, Defendant

Technologies ("Mr. Ramroop"), to determine which colleague was responsible for the complaint. They openly mocked and criticized the complainant in front of Mr. Solano, making him feel uncomfortable and fearful that once his identity was revealed, he would be ostracized by his coworkers.

71.     From November 2, 2023, until December 21, 2023, Mr. Solano did not observe Defendant Meredith vaping in the office. During this time, Mr. Solano's CF symptoms became more manageable again. Believing the issue had been resolved, Plaintiff experienced a temporary sense of relief.

**Defendant Meredith Retaliates Against Plaintiff with Defendants' Approval**

72.     On December 12, 2023, while off work for the day, Mr. Solano discovered that he had been removed from the VCT-Internal email distribution group, effectively cutting him off from the majority of Defendant Technologies' internal company communications, projects, and weekly status meetings.  This action isolated him from his team and made it impossible for Plaintiff to perform his job duties.

73.     Upon information and belief, Defendant Meredith was responsible for this action, as he had control over the email distribution group.

74.     Upon discovering that he had been removed from the email distribution group, Plaintiff complained to Defendant Connelly and requested to be reinstated so he could continue to perform his job effectively.

75.     Despite Mr. Solano explicitly bringing this to Defendant Connelly's attention, his access was never reinstated–pointing clearly to VCT's implicit approval of the action.

76.     That same day, Plaintiff also informed Mr. Volpe about his removal from the distribution group. Mr. Volpe reacted with disbelief and suggested that the action was taken with

malicious intent. Mr. Solano believed that Defendant Meredith had intentionally revoked his access because he had discovered that it was Mr. Solano who had raised health concerns about the in-office vaping.

**Management Makes Nominal Assurances of Resolution**

77.    Starting on or about December 22, 2023, Plaintiff observed that Defendant Meredith had resumed vaping openly in the office.

78.    That same day, Plaintiff began feeling dizzy, faint, and short of breath. Now fully aware of the danger this posed to his health and realizing that Defendants were unwilling to enforce the anti-vaping policy, he sought guidance from his doctor.

79.    Plaintiff also observed Defendant Meredith vaping openly on December 26 and December 27, 2023, and left work early on both days to avoid inhaling second-hand vape smoke.

80.    On December 27, 2023, Plaintiff approached Defendant Logan once again, informing him that his co-workers had resumed vaping in the office. Defendant Logan, visibly frustrated and unwilling to address the issue directly, told Mr. Solano to speak directly with Defendant Meredith himself. Mr. Solano fearing further retaliation from Defendant Meredith, expressed that he was not comfortable doing so. Defendant Logan then instructed him to take the matter to Defendant Connelly.

81.    Mr. Solano contacted Defendant Connelly via text, requesting a call to discuss a health issue in the office. During their 10-minute phone conversation, Plaintiff explained his medical condition of CF and that second-hand vape smoke was exacerbating his symptoms. He asked Defendant Connelly to speak with Defendant Meredith and stop the vaping, offering to provide a medical note if necessary. Defendant Connelly, although appearing angry that Plaintiff had initially spoken to Defendant Logan, assured him he would handle the situation. Plaintiff also

mentioned that the vaping issue extended to other employees, including Mr. Christopher Calice, Mr. Lewis, and Defendant Calice . Defendant Connelly requested that all future complaints be made directly to him, and Plaintiff agreed, clarifying that he just wanted the vaping to stop to protect his health, not to get anyone in trouble.

82.     A few days later, Defendant Connelly privately informed Mr. Solano that the vaping issue was being addressed, that Defendant Meredith had been spoken to, and that Glenn Visco, Defendant Holdings Chief Compliance Officer ("Mr.  Visco"), would be adding a no-smoking/vaping clause to the Employee Handbook. Defendant Connelly made no mention of speaking to Defendant Calice, Mr. Calice, or Mr. Lewis about vaping.

83.     This purported "solution," however, failed to satisfy Mr. Solano, who reasonably believed that few, if any, employees would review the handbook or otherwise be informed of the policy.

84.     He further felt the vaping issue would persist due to Defendant Connelly's insufficient response but avoided expressing his dissatisfaction out of fear of triggering Defendant Connelly's anger. Despite his reservations, Plaintiff decided to trust Defendant Connelly's resolution to the vaping issues.

### Co-workers Ignore the Stated Policy While Management Hides Behind it

85.     In-office vaping continued throughout the spring of 2024, forcing Plaintiff to rely on multiple medications to manage his breathing (aside from his prescribed Trikafta), while living in constant fear of his symptoms worsening.

86.     In March 2024, Plaintiff sought an additional doctor's note due to the ongoing vaping issue and Defendants' ongoing failure to adequately address it.

87.     His fears became reality on April 15, 2024, when Defendant Calice vaped continuously during a 15-minute conference call, sitting directly across from Mr. Solano in a closed conference room. After the call, Plaintiff, wheezing, dizzy, and short of breath, used his rescue inhaler, which provided only temporary relief from his severe symptoms.

88.     He also, once again, observed Defendant Meredith vaping at his desk. On this same day, Mr. Volpe also informed Mr. Solano that Defendant Calice vapes with marijuana oil.

89.     Later that day, Mr. Solano's symptoms became so severe that the rescue inhaler was no longer effective, forcing Mr. Solano to visit an urgent care facility for a nebulizer treatment to control his wheezing and shortness of breath

90.     That evening, Plaintiff emailed Defendant Connelly to report the events, attaching two notes from his doctor and one from the urgent care physician who treated his symptoms. Defendant Connelly responded via email, informing Mr. Solano that he was approved to work from home until an air quality test could be conducted in the office.

91.     Defendant Connelly also stated that there would be a companywide announcement addressing the vaping issue and that it would no longer be tolerated and any employee caught vaping in the office would be immediately terminated.

92.     To Plaintiff's knowledge, no air quality test was ever conducted.

93.     On April 17, 2024, Defendant Connelly called Plaintiff to inform him that Defendant Migliorato wanted to meet with him in person at VCT Group's main office in Hazlet, New Jersey on April 19, 2024.

94.     Mr. Solano immediately perceived this request as a threat and suspected that being called to a meeting in Hazlet with Defendant Migliorato could indicate bad news.

95.    Plaintiff sought advice from his longtime colleague Peter Pianelli, Stockloan Manager at Defendant Clearing ("Mr. Pianelli"). Mr. Pianelli informed Plaintiff that the upcoming meeting with Defendant Migliorato in Hazlet New Jersey was "not good" and Defendants likely intended to "send [Mr. Solano] a message." Mr. Pianelli also suggested that Defendant Migliorato could have scheduled this meeting due to concerns that Mr. Solano would sue VCT Group for their treatment.

96.    Despite his concerns, Plaintiff attended the April 19 meeting with Defendants Migliorato and Connelly. During the meeting, Defendant Migliorato expressed concern for Mr. Solano's wellbeing but also implied that he suspected Plaintiff was building a case against VCT Group.

97.    Mr. Solano reiterated that all he wanted was for the vaping in the office to stop so he could work in a safe environment.

98.    Defendant Migliorato disregarded Mr. Solano's concerns, asserting that Plaintiff's belief that secondhand vaping caused his symptoms was "not scientific," notwithstanding multiple doctors' notes supporting his position, while simultaneously suggesting, without evidence, that Mr. Solano's worsening symptoms might be caused by exposure to vape smoke during his public transit commute.

99.    This was a clear contradiction, as it would require Defendant Migliorato to have believed that vape smoke on the MTA was problematic but vape smoke at VCT offices was not. Defendant Migliorato also emphasized that nobody else in the office ever complained about vaping to which Mr. Solano responded by asking "*Does anybody else in the office have Cystic Fibrosis*?"

100.    During the meeting, Defendant Migliorato also informed Plaintiff that he would be relocated to a new office on the 8th floor once construction was complete, distancing him from the employees vaping on the 17th floor.

101.    Mr. Solano immediately expressed concerns that this accommodation would not be effective, as he would still need to visit the 17th floor to perform his duties, as his job required him to do IT support.

102.    Defendant Migliorato responded that Plaintiff had no choice regarding the office location and that he had granted Mr. Solano one week of remote work to recover.    Defendant Migliorato further stated that a companywide email would be sent to address the vaping issues and he instructed Mr. Solano to direct any future complaints about coworkers vaping directly to him and to inform him who the culprits were.

103.    On April 26, 2024, Dominique Migliorato, Human Resources Director for Defendant Holdings (and Defendant Migliorato's wife) ("Mrs. Migliorato"), sent an email to all employees of VCT Group, advising them that, effective immediately, smoking and vaping were strictly prohibited. This email also stated that violators of this policy were subject to potential disciplinary action, up to and including termination.

104.    Curiously, Mr. Solano observed this announcement to constitute a rolling back from the policy referenced in Defendant Connelly's email to Mr. Solano, as the previous email stated that vaping would result in immediate termination.

105.    On April 29, 2024, Plaintiff returned to work in person on the 17th floor.

**<u>Defendants Retaliate Against Plaintiff</u>**

106.    In May 2024, hostility from Defendant Meredith continued to escalate, as he utilized his position as Technologies IT Manager and supervisor to retaliate against Mr. Solano.

107.    For instance, Plaintiff and Mr. Volpe were co-leading a Windows domain restructuring project to separate the business entities from a technology/infrastructure perspective. Defendant Meredith abruptly removed Mr. Solano as co-lead and excluded him from internal communications regarding the project. This effectively ensured that Plaintiff would not receive credit for his own contributions and his work responsibilities were assigned to other employees.

108.    Upon information and belief, other employees of VCT Group began to fear associating with Mr. Solano due to Defendant Meredith's retaliation. For instance, Mr. Solano observed that Doug Friedman, another IT Specialist ("Mr. Friedman"), concealed the fact that he was working with Mr. Solano on a PowerShell Automation project from Defendant Meredith.

109.    In late May 2024, Defendant Migliorato invited Plaintiff to view the new office VCT Group was setting up on the 8th floor of 199 Water Street. During this visit, Defendant Migliorato asked Mr. Solano to address several outstanding IT tasks related to the new office, instructing him further to collaborate with Defendant Meredith on the project.

110.    Later that same day, upon returning to the 17th floor, Mr. Solano was approached by Roy Yan, Chief Executive Officer of Defendant Capital ("CEO Yan"), to discuss IT tasks for the new 8th floor office.  Apparently, Defendant Meredith had overheard Defendant  Migliorato's instructions to Mr. Solano, and, despite Defendant Migliorato's explicit instructions for Mr. Solano to be involved in the project, advised CEO Yan that all project discussions should go directly through him.

111.    Defendant Meredith had further stated that Mr. Solano was not involved in the project and implied that if CEO Yan wanted the project done properly, Plaintiff should not be included, publicly insulting and humiliating Plaintiff.

112.    CEO Yan, visibly rattled by the rude interaction, had backed away. Mr. Friedman, who also witnessed the conversation, expressed concern to Plaintiff about Defendant Meredith's hostility towards Plaintiff.

113.    Plaintiff informed Defendant Migliorato about the conversation with CEO Yan and Mr. Meredith's behavior. Defendant Migliorato, however, merely advised him to ignore it and "stand down."

114.    Defendant Meredith's hostility toward plaintiff continued, culminating in verbal abuse during a June 18, 2024, meeting. Defendant Meredith ridiculed Mr. Solano, in the presence of Mr. Volpe, Sajjad Somjee, Defendant Technologies CTO ("CTO Somjee"), and Defendant Connelly, and had to be told multiple times by both Defendant Connelly and CTO Somjee to calm down.

115.    During the outburst, Defendant Meredith told Defendant Connelly and CTO Somjee that Mr. Solano "did not fit in" at VCT Group and labeled him as "disruptive."  Mr. Volpe also joined in berating Plaintiff during this meeting.

116.    Plaintiff also requested, again, to be reinstated in the VCT Internal Distribution group, and Defendant Meredith strongly advised against it.

117.    That same day, Mr. Solano spoke again to Defendant Connelly, voicing concerns about the hostile treatment he was receiving from both Defendant Meredith and Mr. Volpe. Mr. Solano explained that he felt that they were exploiting his lack of title to mistreat him and requested a title that would place him on equal footing with them to ensure fair treatment.

118.    Shockingly, however, Defendant Connelly expressed to Plaintiff that he "no longer had a title."

119.    On or about June 20, 2024, Plaintiff met with Defendant Logan to inform him about the outcome of the June 18th meeting and Defendant Meredith's verbal abuse. Defendant Logan responded, "*What did you expect from [Mr. Meredith]? You complained about his vape smoking several times. You guys are not going to be best friends.*"

120.    This statement made clear to Plaintiff that he was being retaliated against for engaging in protected activity, and that all involved parties were aware of the retaliation but intentionally chose to do nothing to stop it.

**Plaintiff Reports Further Vaping to Defendant Migliorato**

121.    On or about June 26, 2024, Plaintiff witnessed Defendant Calice vaping directly outside of Defendant Logan's office. Upon information and belief, Defendant Logan was watching as Plaintiff observed Defendant Calice openly vaping.

122.    Following Defendant Migliorato's instructions from their April 2024 meeting in Hazlet, New Jersey, Mr. Solano emailed Defendant Migliorato to report that Defendant Calice had been vaping in the office. Defendant Migliorato thanked him for the report and invited him to meet at the office to discuss the matter on June 28, 2024.

123.    On June 28, 2024, concerned about jeopardizing his health by returning to the environment that was worsening his symptoms, Mr. Solano requested that Defendant Migliorato call him to discuss the matter instead of meeting in person. Defendant Migliorato declined the request.

124.    Upon information and belief, Defendant Calice was not disciplined, or terminated, for his blatant violation of VCT Group's Anti-Vaping and Smoking Policy.

**VCT Group Retaliates Against Plaintiff by Launching a Sham Audit**

125.    On June 28, 2024, at 7:00 P.M., Mr. Solano discovered that his access to VCT Group's email, phone, Teams, Slack, and other services, had been cut off. He had received no prior notice or explanation for this action.

126.    On Sunday, June 30, 2024, Defendant Connelly emailed Mr. Solano, informing him that he was being placed on paid leave pending a "cyber security investigation," and that Defendant Connelly would update him as soon as possible. From this email, Plaintiff understood that he was being investigated for potential wrongdoing.

127.    Over the following three weeks, Mr. Solano experienced intense stress and anxiety, fearing that the Defendants intended to fabricate claims of misconduct that would unjustly harm his reputation and jeopardize his future career. As a result of the mental distress caused by VCT's retaliation, Plaintiff sought therapy to help alleviate some of the pressure.

**Despite Finding No Wrongdoing, VCT Group Terminates Plaintiff's Employment**

128.    On July 19, 2024, Defendant Bracero contacted Mr. Solano via telephone. During the five-minute call, Defendant Bracero informed Plaintiff that his position was being eliminated due to Defendant deeming his position "redundant."

129.    When Mr. Solano inquired about the cyber security investigation, Defendant Bracero confirmed that no negative information had been found in his file and that no wrongdoing had been discovered.

130.    VCT Group offered Mr. Solano a severance package, citing that the firm did not want to part on bad terms. However, knowing that the stated reason for his termination was merely a pretext for disability discrimination and retaliation for seeking accommodation, Mr. Solano declined to accept it.

131.    As of late September 2024, Plaintiff no longer requires the use of a nebulizer or Symbicort to maintain stable, normal breathing. In sum, since leaving a workplace where he was constantly exposed to second-hand vaping nearly every day for nineteen months, Plaintiff is free of symptoms without the need for medication, other than his prescribed Trikafta.

132.    As of June 2025, Plaintiff sometimes struggles with breathing symptoms, requiring rescue inhaler and occasional Symbicort.  Plaintiff has concerns his breathing will never return to what it was, prior to starting work at VCT Technologies.

### *FIRST* CAUSE OF ACTION
### FOR DISCRIMINATION UNDER THE ADA

133.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

134.    The ADA prohibits disparate treatment in employment on the basis of a disability.

135.    Defendants intentionally discriminated against Plaintiff because of his Cystic Fibrosis in violation of the ADA. Defendants discriminated against Plaintiff by, *inter alia*, failing to accommodate his disability, failing to prevent abuse from his colleagues due to his disability, and terminating his employment for pretextual reasons due to his disability.

136.    Defendants acted in a willful and wanton manner and in callous disregard for Plaintiff's federally protected rights and physical well-being.

137.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

138.    Plaintiff requests relief as hereinafter described.

### *SECOND* CAUSE OF ACTION

**FOR RETALIATION UNDER THE ADA**

139.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

140.    The ADA prohibits retaliation for the protected activities of requesting disability accommodation and reporting discrimination on the basis of disability.

141.    Defendants retaliated against Plaintiff by, *inter alia*, failing to prevent abuse from his colleagues due to his report, and terminating his employment for pretextual reasons due to his reporting discrimination.

142.    Defendants acted in a willful and wanton manner and in callous disregard for Plaintiff's federally protected rights and physical wellbeing.

143.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

144.    Plaintiff requests relief as hereinafter described.

**_THIRD_ CAUSE OF ACTION**
**FOR DISABILITY DISCRIMINATION UNDER THE NYSHRL**

145.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

146.    The NYSHRL prohibits disparate treatment in employment on the basis of a disability.

147.    Defendants intentionally discriminated against Plaintiff because of his Cystic Fibrosis in violation of the NYSHRL. Defendants discriminated against Plaintiff by, *inter alia*,

failing to accommodate his disability, failing to prevent abuse from his colleagues due to his disability, and ultimately pretextually terminated his employment due to his disability.

148.    Defendants acted in a willful and wanton manner and in callous disregard for Plaintiff's state protected rights and physical wellbeing.

149.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

150.    Plaintiff requests relief as hereinafter described.

### *FOURTH* CAUSE OF ACTION
### <u>FOR RETALIATION UNDER THE NYSHRL</u>

151.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

152.    The <u>NYSHRL</u> prohibits retaliation for the protected activities of requesting disability accommodation and reporting discrimination on the basis of disability.

153.    Defendants retaliated against Plaintiff by, *inter alia*, failing to prevent abuse from his colleagues due to his report, and terminating his employment for pretextual reasons due to his reporting discrimination.

154.    Defendants acted in a willful and wanton manner and in callous disregard for Plaintiff's federally protected rights and physical wellbeing.

155.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to loss of

substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

156.     Plaintiff requests relief as hereinafter described.

### *FIFTH* CAUSE OF ACTION
### FOR DISABILITY DISCRIMINATION UNDER THE NYCHRL

157.     Plaintiff incorporates by reference the preceding paragraphs as alleged above.

158.     The NYCHRL prohibits disparate treatment in employment on the basis of a disability.

159.     Defendants intentionally discriminated against Plaintiff because of his Cystic Fibrosis in violation of the NYCHRL. Defendants discriminated against Plaintiff by, *inter alia*, failing to accommodate his disability, failing to prevent abuse from his colleagues due to his disability, and ultimately pretextually terminated his employment due to his disability.

160.     Defendants acted in a willful and wanton manner and in callous disregard for Plaintiff's state protected rights and physical wellbeing.

161.     As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

162.     Plaintiff requests relief as hereinafter described.

### *SIXTH* CAUSE OF ACTION
### FOR RETALIATION UNDER THE NYCHRL

163.     Plaintiff incorporates by reference the preceding paragraphs as alleged above.

26

164.    The <u>NYCHRL</u> prohibits retaliation for the protected activities of requesting disability accommodation and reporting discrimination on the basis of disability.

165.    Defendants retaliated against Plaintiff by, *inter alia*, failing to prevent abuse from his colleagues due to his report, and terminating his employment for pretextual reasons due to his reporting discrimination.

166.    Defendants acted in a willful and wanton manner and in callous disregard for Plaintiff's federally protected rights and physical wellbeing.

167.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

### *SEVENTH* CAUSE OF ACTION
### FOR DISCRIMINATION/RETALIATION UNDER THE NYSHRL
*(Individual Liability against Individual Defendants)*

168.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

169.    <u>New York State Executive Law</u> § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to **aid, abet,** incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

170.    Defendants Dominick Migliorato, Michael Logan, Robert Calice, Tim Connelly, John Meredith and Frank Bracero (Individual Defendants) violated the section cited herein as set forth and were personally involved in the discriminatory and retaliatory actions about which Plaintiff complains herein.

171.    Individual Defendants utilized their power, authority, status and positions to subject Plaintiff to the wrongful treatment outlined in this Complaint.

172.    But for Individual Defendants position at VCT Group, Individual Defendants would not have been able or authorized to take and continue their discriminatory and retaliatory campaign against Plaintiff.

173.    Individual Defendants acting pursuant to their authority, ignored VCT Groups' own policies, procedures, and rules regarding discriminatory behavior in the workplace generally.

174.    Corporate Defendant and Individual Defendants had no good faith business justification for any of the actions taken against PLAINTIFF as alleged herein.

175.    Defendants retaliated against Plaintiff by, *inter alia*, failing to prevent abuse from his colleagues due to his report, and terminating his employment for pretextual reasons due to his reporting discrimination.

176.    Defendants acted in a willful and wanton manner and in callous disregard for Plaintiff's federally protected rights and physical wellbeing.

177.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

178.    Plaintiff requests relief as hereinafter described.

### *EIGHT* CAUSE OF ACTION
### FOR DISCRIMINATION/RETALIATION UNDER THE NYCHRL
*(Aider and Abettor Liability against Individual Defendants)*

179.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

180. The <u>New York City Administrative Code</u> § 8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

181. Individual Defendants engaged in an unlawful discriminatory practice in violation of <u>New York City Administrative Code</u> § 8-107(6) by aiding, abetting, inciting, compelling, and coercing the above discriminatory, unlawful, and retaliatory conduct.

182. But for Plaintiff's disabilities and request for reasonable accommodations, Corporate Defendants and Individual Defenants would not have terminated PLAINTIFF'S employment.

183. Corporate Defendants and Individual Defendants had no good faith business justification for any of the actions taken against PLAINTIFF as alleged herein.

184. Individual Defendants aided and abetted Corporate Defendants in their discrimination against Plaintiff.

185. But for Individual Defendants position at VCT Group, Individual Defendants would not have been able or authorized to take and continue their discriminatory and retaliatory campaign against Plaintiff.

186. Individual Defendants acting pursuant to their authority, ignored VCT Groups' own policies, procedures, and rules regarding discriminatory behavior in the workplace generally.

187. Defendants discriminated and retaliated against Plaintiff by, *inter alia*, failing to prevent abuse from his colleagues due to his report, and terminating his employment for pretextual reasons due to his reporting discrimination.

188. Defendants acted in a willful and wanton manner and in callous disregard for Plaintiff's federally protected rights and physical wellbeing.

189.     As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff

has suffered and will continue to suffer considerable injury, including but not limited to loss of

substantial past and future salary and income, mental anguish, emotional distress, humiliation,

and other compensable damages unless and until this Court grants relief.

190.     Plaintiff requests relief as hereinafter described.

## JURY DEMAND

191.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury in this action.

## PRAYER FOR RELIEF

192.     WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

(a)     declaring that the acts and practices complained of herein are violations of the ADA, the NYSHRL, and the NYCHRL;

(b)     enjoining and permanently restraining these violations;

(c)     directing Defendants to take such affirmative action as is necessary to ensure that the effects of these violations are eliminated;

(d)     directing Defendants to place Plaintiff in the position he would have occupied but for Defendant's discriminatory treatment, and to make him whole for all earnings he would have received but for Defendants' discriminatory treatment, including but not limited to wages, pension, interest, and other lost benefits;

(e)     directing Defendants to pay Plaintiff compensatory damages for his mental anguish and emotional distress;

(f)     directing Defendants to pay Plaintiff punitive damages;

(g)     awarding Plaintiff pre- and post-judgment interest;

(h)     awarding Plaintiff the costs of this action together with reasonable attorneys' fees; and

(i)     granting such other and further relief as this Court deems necessary and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Dated:  November 4, 2025
          Bellport, New York

**MESIDOR PLLC**

Marjorie Mesidor
Joseph Myers
Alexandria Jean-Pierre
*Attorneys for Plaintiff*
30 Station Road, Suite 5
Bellport, New York 11713
(212) 930-6010
mm@marjoriemesidor.com
jm@marjoriemesidor.com
aj@marjoriemesidor.com

31